Mr. Justice Cox
delivered the opinion of the court.
The object of this suit is to have certain conveyances of real estate, heretofore made to, or in trust for, Mrs. Entwisle, ■declared fraudulent and void as against the creditors of Entwisle & Barron, and to subject the property conveyed to the payment of their debts.
The conveyances referred to in the bill are as follows, viz.:
On January 9th, 1864, lot 3 in subdivision of part of square 127, in Washington, was purchased of Samuel Y. Niles for $2,638.35, and conveyed by him to John Larcombe, in trust for the exclusive use of Mrs. Entwisle.
On March 12, 1866, lot 2 in the same subdivision was bought from Wm. W. Corcoran for $2,550, and conveyed by him to Larcombe and Thomas Berry on the same trusts.
On April 19th, 1872, part of lot 7 in square 75 was bought from George P. Hamlin for $2,600, and conveyed by him directly to Mrs. Entwisle.
On May 3, 1873, lot 11 in square 28 was bought from *53 ¥m. J. Wilson for $1,323.40, and by him conveyed directly to Mrs. Entwisle.
The first lot was improved by Entwisle, by .the erection of a brick dwelling.
The second lot was improved in the same manner, and afterwards sold to Philip Phillips, and is not embraced in this suit.
The third lot was already improved when purchased.
The fourth lot was subdivided, after the purchase, and improved by the erection of two or more frame houses.
In 1878, Entwisle & Barron were adjudicated bankrupts, being then indebted to the amount of $50,000, and exhibiting no assets.
At that time the title to the first, third and fourth of the above lots remained as shown in the conveyance above recited, and the property was of the assessed value of about $17,000.
It is claimed on the part of the complainant that these several lots were purchased and the improvements erected on them, by Entwisle, partly with his own means, but principally with the means of Entwisle & Barron ; that he, from time to time, paid large sums of money from the firm resources, on account of the same property, for taxes and repairs and interest on incumbrances, which sums were so many additional settlements on his wife ; that these settlements were without consideration and voluntary ; that during the period of these outlays he and Barron had no property other than the current receipts of their business, and were largely indebted and embarrassed ; that the property before described was conveyed by Entwisle’s procurement, to his wife, to protect it from his creditors, and all the settlements were in fraud of those creditors, and the property ought, therefore, to be held as assets for payment of their debts.
Eor the defence it is claimed that, although the first settlement of 1864 might have been assailed by then existing creditors, these have long since been paid, and there are no debts now in existence antedating 1869, and for the purposes of this case, and as to the creditors represented by the *54 assignee, that settlement must therefore be deemed valid ; that the other purchases were made and the improvements erected on the property so purchased, partly with money borrowed by Mrs. Entwisle from J. S. Bartruff, which is still unpaid, and partly with the income derived by her from the first property bought from Niles, and are therefore entitled to the same protection from creditors ; that the payments made by Entwisle, from time to time, for taxes, repairs and interest, and which may be claimed to have gone into the property, were fully reimbursed by the return to him, for the business of the firm, of $8,000 from the proceeds of the sale to Phillips.
Thomas B. Entwisle first failed in business in 1856. Shortly after this he entered into partnership with Barron.
In 1864, and at the date of the first conveyance to his wife, a large amount of his debts remained unpaid. Perhaps more than half the amount had been overdue for more than three years, but it does not appear how far the defence of limitations could have been successfully made to them. But there remained, confessedly, some $5,000 or more of these debts which might have been sued on. It is admitted that the Niles lot was purchased and the improvements on it erected, in part, with the proceeds of a farm sold by Entwisle, from which he realized some $5,000. The additional cost of the improvements came from the funds of Entwisle & Barron. This farm was all the property that Entwisle then owned, and Barron had none. It was then a voluntary settlement by Entwisle, on his wife, of all his property, -when he was indebted in an amount fully equal to the value of the property so settled, if not twice as large. His business prospects are said to have been good at that time, and he may have had abundant reason to expect to pay all these debts from the profits of his business ; but nothing is better settled than that a debtor is not allowed to give away all his property to his family and leave his creditors nothing to rely on but his expectations. It seems to be conceded by the defence, or not seriously contested, that this settlement could *55 not have prevailed against the creditors of that date, had they chosen to attack it.
The rule formerly held on this subject by Chancellor Kent .■and others was very strict. It was, that a voluntary conveyance by a debtor was absolutely void as against existing •creditors, no matter how small the proportion of the property •conveyed to the rest of his property. The fraud was deemed •a conclusion of law, without reference to the actual intent •of the debtor, and that, although he may have had abundant property to pay his debts with. It was seen, however, that to enforce so harsh a view in favor of subsequent creditors also, would be unreasonable. And hence, as to them, it was required to prove actual fraud ; and a distinction was somewhat vaguely drawn between fraud in law as in the case .supposed, which might be compatible with innocent intentions, and fraud in fad which involved the actual intent to •defraud. Fraud in law existed wherever a debtor conveyed .any part of his property voluntarily, i. e., without consider.ation. But as to fraud in fact, which it was necessary to establish, to entitle subsequent creditors to relief, it was held that this might be made out either by showing that ■the voluntary settlement had express reference to the contracting of the subsequent debts, or by showing'such an in•debtedness at the time of the settlement as to raise a presumption of fraudulent intent. The Supreme Court of the United States and other courts in the States reject Chancellor Kent’s doctrine, and hold that the mere fact of indebtedness .at the time of a voluntary settlement does not invalidate it, but that the indebtedness must appear to be so large as to make the withdrawal of the settled property from the debtor’s resources, an embarrassment to the creditors. The latter views of the courts do not keep up the distinction between fraud in law and fraud in fact,- but they hold the voluntary •conveyance by a debtor, when it interferes with the security of existing creditors, as presumptively fraudulent, in fact, and in such case, subsequent creditors are allowed to im'peach it. It is not a conclusive presumption of law, but it is sufficient to make out a- case for either existing or sub *56 sequent creditors, to show that the debtor was so embarassecl at the time of his voluntary settlement that it could not be made without prejudice to his creditors of that date.
These views will be found sustained in the following cases,, among others: Redfield vs. Buck, 35 Com., 328; Horn vs. Volcano Co., 13 Cal., 62; Thompson vs. Dougherty, 14 S. & R., 448; Churchill vs. Wells, 7 Coldwell, 364; Hutchinson vs. Kelly, 1 Robinson, 123; Iley vs. Niswanger, 1 McCord, 299; Madden vs. Day, 1 Bailey, 337; Beach vs. White, Walker Ch., 496; Hurdt vs. Courtenay, 4 Metc., 140; Lowry vs. Lowry, 2 Bush., 70; 1 Amer. Leading Cases, 41 et seq. As was plainly expressed in the case in 13 Cal., evidence of intent to defraud existing creditors is prima facie evidence of fraud against subsequent creditors. Once shown to have a fraudulent design, a party will not be listened to in the effort to qualify his own wrong, but it will be deemed to extend to-all who may be affected by his conduct.
Under the rule sanctioned by these authorities, we have no doubt of the right of subsequent creditors to assail the conveyance in question in the light of the evidence already adverted to.
But,-as has been already said, the presumption of fraud arising from á voluntary conveyance by one largely indebted,, is not conclusive. It may be rebutted by showing that the existing debts were secured by mortgage, or were provided for in the settlement itself, or that they have since been, fully paid off.
The defence in this case rely on the fact that all the indebtedness existing when the settlement of 1864 was made-has since been paid off’.
The fact of a payment of prior debts is only valuable as-evidence on the question of intent to defraud, and there are circumstances under which it has no value in that direction. If, for example, a subsequent debt is created by borrowing-money to pay a prior debt with, it is evident that the debtor has paid nothing ; the new creditor has paid the old. The evidence against the debtor in favor of the old creditor has been removed at the expense of the new. It would be in *57 equitable to allow the latter to he prejudiced by such a proceeding, and hence the courts say, in a general way, that the indebtedness, in such case, has not been paid, but transferred, and that the new creditor should be subrogated to the old.
It would not seem to make any difference, in such case, if the first subsequent creditor should, himself, be- paid by another loan from a third creditor. The indebtedness would only be transferred one step further on.
Nor would it seem to make any difference in principle, if the debtor, instead of borrowing money from the new creditor and directly applying it to the payment of the old debt, should purchase goods on credit, and out of the proceeds, which ought to be applied to pay their price, discharge his old debt.
That very case is covered by the language of the court in Savage vs. Murphy, 84 N. Y., 508, in which it is recited that the debtor continued in business, making use of the avails of each successive purchase to pay off his debts.
In short, when a debtor, by paying off' an antecedent debt, does not lessen his indebtedness, but continues indebted all the time, and only relieves that condition in one direction by increasing it in another, the case is treated as if the prior indebtedness had continued throughout. See, on this subject, Madden vs. Day, supra; Savage vs. Murphy, supra; and McElwee vs. Sulton, 2 Bailey (S. C.), 128; Paulk vs. Cooke, 39 Conn., 566.
In this case it appears that Entwisle and Barron were partners in the business of building. All their debts represented by this assignee were incurred in that business, and are for materials purchased and labor employed. All the money they received was in payment for those materials and that labor, and their own personal labor. That money was the only fund to which their creditors could look for payment, for the partners had no tangible property. But it was that very fund out of which Entwisle paid his old creditors. Every dollar so paid to these was so much taken from the creditors who are still unpaid. It would seem strange that payment thus made, at their expense, should deprive them *58 of their equities founded on the indebtedness so discharged ; and such, we think, is not the doctrine of the courts. We, therefore, think the assignee entitled to assail the settlement of 1864, on the ground of the indebtedness of Entwisle at that date.
If that settlement be void, it would follow that if the later acquisitions were, as contended for the defense, the mere fruit and outgrowth of that, they must share the same fate.
Still more clearly must this be the case if they are to be treated as so many new voluntary donations, as the two, latest ones post-dated the creation of some of the present indebtedness.
Whether the later conveyances were additional gifts of Entwisle to his wife, and whether the sums of money advanced by him for repairs, taxes and-interest on encumbrances, exceeding $5,000 in amount, are to be considered as additional gifts, making a part of the property ; or these, on the other hand, are to be considered reimbursed to the firm by the sum of $8,000 received from the proceeds of the sale to Phillips, are questions of fact which the conclusions already announced render it unnecessary to examine at length. 'The burden of proving the expenditures to have come from her separate estate is clearly upon the wife, according to the ruling of the Supreme Court in Seitz vs. Mitchell. Against her claim we have the improbability that the first investment would have more than doubled itself in nine or ten years, over and above all expenses ; the fact that a part of the means employed was derived from the sale of furniture owned by the husband, and from the wife’s own labor in keeping a boarding house, which labor was the legal property of the husband; and the absence of any definite proof ascertaining exactly what proportion was strictly revenue from the property first settled upon her, which would be most material if that were considered free from the attacks of creditors. And in addition to these features, is the important one, conspicuous through the whole history, that just as the firm became more and more involved, the property of Mrs. Entwisle grew in bulk. If we were called upon *59 to decide whether the subsequent purchases were the product ■of the first, we should feel that the defendants had failed •satisfactorily to establish it.
There are other features in the case to be considered.
One may hinder, delay and defraud his creditors in either of two ways, viz., either by really giving away property which ought to be consecrated to their protection, or by ¡seeming to do so while really retaining the beneficial ownership himself. If Entwisle had had these pieces of property •conveyed to another person than his wife — to a mere friend for example' — and it appeared to the court that, notwithstanding the apparent record title in the donee, Entwisle had continued all the time to pay the taxes and repairs and interest on encumbrances, had raised money on it for his •own use by deeds of trust, and had applied the largest part •of the proceeds of a part of it, $8,000, to his own use, such facts would be absolutely conclusive evidence to any court that he had remained all the time the real owner, and that the conveyances were a mere cover to protect the property from creditors. Does it make a difference that the donee is the debtor’s wife ? It is true that a wife, more than any other gratuitous donee, might be expected to relinquish the subject of the gift, or allow the husband to use it, from time to time, according to the exigencies of his affairs ; but, still, the difference seems to me to be only a difference of degree in the force of evidence such facts supply, as to the continued ownership of the donor, and it does not seem to me that even a wife can allow to her husband the control and beneficial use of property previously settled on her by him, to the extent disclosed in this case, except at the risk of having it declared by the courts to be his property and answerable for his debts.
It is objected that the averments of the bill are not such as to justify the relief claimed in argument, on the general grounds we have before indicated.
We find it distinctly averred in the bill that the several conveyances to or in trust for Mr. Entwistle were made by his procurement and for considerations paid by him out *60 of his own means or those of the firm, at times when he was largely indebted ; and that they were made with intent to evade the .payment of his debts, existing at the times of the several conveyances, and, generally, with intent to hinder, delay and defraud his creditors of their right to-satisfaction out of his property, and that at the dates of the-several conveyances, and before and after them, he was indebted to a large number of persons, including those named in the bankruptcy schedule. Assuming these averments to-be proved, a case is made out which, according to the views, we have enunciated, entitles either prior or subsequent creditors to relief.
"We have thought the averments of the bill sustained by the proofs, at least so far as the legal presumptions of fraud are sufficient for that purpose, and are unable to see any discrepancy between'the allegata and probata.
It is true that it was shown in evidence and relied on in argument, that the antecedent debts had been paid. And it was answered to this, both on the evidence and argument, that they were paid bj- creating new indebtedness. And it seemed to be intimated in argument that this latter feature of the case was an essential part of the complainant’s case and ought to be set forth in his pleadings.
It seems to us sufficient for the complainant to state the prima facie case which entitles him to relief. The fact of payment of the prior indebtedness, which might be an answer to that case, was matter of defence. The complainant was not bound to anticipate and forestall it. If the defendants, had averred the fact in their answers, the complainant could only have met it in evidence. But in truth, as already intimated, this fact of payment of prior debts is only evidence on the general question of fraudulent intent, and if so, neither that nor the countervailing and responsive evidence need be made the subject of special averment by either party. ■
Our conclusion is, that the decree of the court below be reversed, and the cause be remanded with directions to enter a decree directing a sale of the property described in the proceedings for the payment of the debts.
*61 Mr. Chief-Justice Cartter :
While concurring in the opinion so ably elaborated by my brother, I wish to add an additional view of this case, which, it seems to me, more emphatically justifies our conclusion-
If a fraud in law or in fact was perpetrated in this case, it was perpetrated against the rights of the creditors of Entwisle & Barron, for it appears that it was the money of this firm that was drawn into contribution to acquire the property in question. Entwisle had failed. He was largely broken up at the date of the inception of the copartnership between himself and Barron. He never did satisfy the whole of the indebtedness then owed by him, although, be it said to his personal credit, that he endeavored to do it — for that is manifest — but his will was much larger than his ability. A large poi’tion of that antecedent indebtedness became barred by limitations, and all of it that ever was paid was paid out of the substance of Entwisle & Barron^ and through the material and credit that they had derived from the creditors of Entwisle & Barron. So w'e have superadded to the ordinary case of a debtor, transferring his property or making a gratuity of it in the presence of indebtedness, the fact of his transferring substance derived from the creditors of the new firm to his individual credit. Now, he has no right to do that without the sanction of the parties. He had no right to gratify his individual debtor by the transfer of the substance of Entwisle & Barron. That transfer is void as against the creditors of the firm. They have an equitable lien upon the substance that they part with upon the credit of the firm, and have the highest right that equity can create to be reimbursed out of it.
Here the creditors of Entwisle & Barron are made to pay contribution to the individual creditors of Entwisle, of a period antecedent to the partnership.
Now, if the property of these creditors of the firm can be traced into that channel they ought to have the right to recover it.
But we have another feature in this case. Entwisle not *62 only perverted the substance of Entwisle & Barron to the use and benefit of his individual creditors, but he started out on another enterprise, and that was giving it away to his wife.
Now, if a co-partner has not the power to appropriate to his individual indebtedness the assets of a firm without the consent of the co-partner, has he a right to give it away without his consent? You have a man giving away what does not belong to him, and without the moral excuse of using it to pay his debts. So this ’Voluntary gift to a wife of co-partnership property, derived from co-partnership creditors, has the vice of giving away what the donor has no title to.
The creditors here never were the creditors of Entwisle, but the creditors of Entwisle & Barron. And we have in this case the feature of the creditors of such a firm wrested of their substance for the gratification of a gratuity of one of the co-partners.
Now, these views strengthen very much, in my judgment, the ground so ably elaborated by my brother, and although thoroughly in accord with the opinion just delivered, I think that this additional view of the case is the strongest feature in it, and is unanswerable. Entwisle had no power to give away this property. It was in fraud of his partner and in fraud of the creditors of the firm, and, as I understand it, equity will denounce the gift as void.
Of course I make these remarks with the utmost respect for the chief party in the defence, for I regard him, personally, highly; but he has certainly made a great mistake here.